IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY BECKER, : | |
|    Plaintiff, : | No. 19-cv-5126-JMY |
| : | |
| vs. : | |
| : | |
| NOVIPAX, LLC, : | |
|    Defendant. : | |

**MEMORANDUM**

**Younge, J.**                                                                                      **January 21, 2022**

      Currently before the Court is Defendant's Motion for Summary Judgment. The Court finds this matter appropriate for resolution without oral argument. See Fed. R. Civ. P. 78; L.R. 7.1(f). For the reasons set forth below, the Court will grant the Defendant's Motion.

**I.    BACKGROUND**

    **A.    Procedural Background**

      Plaintiff commenced this employment discrimination action by filing a Complaint on October 31, 2019. (Complaint, ECF No. 1.) To summarize in the most concise form, the Complaint sets forth a cause of action for reverse-racial discrimination arising from events surrounding Defendant's March 19, 2018, decision to terminate Plaintiff from his position as a Shipping Materials Handler at its Reading packing facility. (Pl's Resp. to SMF ¶ 65.) In Counts I and II of the Complaint, Plaintiff proceeds on two separate theories seeking relief in the form of monetary damages, attorney's fees and associated costs. In Count I of the Complaint, Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.*, (hereinafter "Title VII") when it terminated his employment. In Count II, Plaintiff alleges that Defendant's conduct was in violation of 42 U.S.C. § 1981 (hereinafter "Section 1981").

Defendant filed an Answer to the Complaint on January 6, 2020, (Answer, ECF No. 3), and the Court entered a Scheduling Order on February 11, 2020. (ECF No. 12.) After conducting discovery, Defendant filed its motion for summary judgment which the Court will now grant.

### B.   Factual Background

Defendant manufactures polystyrene foam trays and absorbent pads for packaging raw meats. (Resp. to SMF ¶ 1, ECF No. 20.) Tyson Foods is one of Defendant's main clients. Plaintiff began working for Defendant's predecessor, W.R. Grace & Co., on May 5, 1985 at its Reading, Pennsylvania warehouse and packaging facility. (Novipax's Statement of Material Facts "SMF" ¶ 1-3, ECF No. 18-1; Becker Deposition p. 34, SJM Ex. A, ECF No. 18-8.) He continued to work at the Reading facility after it was taken over by Defendant. Plaintiff worked in various roles over the course of the roughly 23 years he worked at the Reading facility. (Becker Deposition p. 34.) He began working as a Packer, then later as a Shipping Helper, and finally as a Shipping Material Handler. (*Id.* p. 35.) Plaintiff self-identifies as a white Caucasian male who does not speak Spanish and is not Hispanic. (Complaint ¶ 10; Becker Deposition p. 37.)

Plaintiff alleges that Defendant terminated his employment as a result of reverse-racial discrimination by Shipping Supervisor, Janet Pena-Santiago, Distribution Coordinator, Jose Amarante, and the first-shift Distribution Coordinator, Charles Contreras. (Complaint.) In September of 2016, Pena-Santiago became Plaintiff's Shipping Supervisor, overseeing his work up and until he was terminated in March of 2018. (Pena-Santiago Deposition pp. 18, 47, SJM Ex. B, ECF No. 18-9.) Pena-Santiago was married to Charles Contreras, and he worked at Defendant's Reading facility as a Distribution Coordinator. (*Id.* p. 10.) There were three

Distribution Coordinators who worked at the Reading facility—Charles Contreras, Jose Amarante, and Jose Flores.  (*Id.* p. 20.)  The Distribution Coordinators had limited supervisory authority over Shipping Handlers like the Plaintiff.  (*Id.* pp. 20-21.)

Shortly after Penn-Santiago took over as Plaintiff's supervisor in September of 2016, she began to receive complaints from other employees about Plaintiff not wearing his seatbelt when operating clamp trucks used to load freight.  (*Id.* pp. 47-50.)  She testified that she spoke to Plaintiff on an informal basis about these safety concerns, and she did not write him up or take any formal action.  (*Id.*)  Evidence in the record suggests that Pena-Santiago addressed the entire staff about the need to wear a seatbelt when operating clamp trucks on the warehouse floor.  (Snead Deposition p. 71.)

After Pena-Santiago spoke to Plaintiff about the need to wear his seatbelt, Plaintiff spoke to coworker, Marc Snead, about his safety concerns related to the Distribution Coordinators who operated the truck jockeys to move trailers around the warehouse yard.  (Snead Deposition p. 74, 93-94, SJM Ex. J, ECF No. 18-17.)  According to Snead, Plaintiff informed him that the Distribution Coordinators were not using seatbelts or turning on external safety lights on the truck jockeys when moving trailers around the yard.  (*Id.*)  Plaintiff decided to report what he felt were safety violations to Robert Weaver, the warehouse Safety Supervisor.  (Becker Deposition p. 127-128.)

**Plaintiff's October 2017 Time-Clock Warning**

On October 12, 2017, Plaintiff clocked in thirty minutes early for a 2:00 p.m. mandatory safety meeting.  (Resp. to SMF ¶ 30.)  Plaintiff claimed that he and another employee, Marc Snead, clocked in early because they wanted to talk to Safety Supervisor, Robert Weaver, about the safety concerns related to the Distribution Coordinators' operation of the truck jockeys.

3

(Resp. to SMF ¶ 32, Becker Deposition p. 127-128, Snead Deposition p. 74, 93-94.) However, Plaintiff did not have a scheduled meeting with Mr. Weaver and was unable to locate him; therefore, he did not meet with Mr. Weaver on October 12, 2017. (Resp. SMF ¶ 34, Becker Deposition p. 130.) Pena-Santiago noticed that the Plaintiff had clocked in early at 1:30 and charged the time card back to 2:00 p.m. (Pena-Santiago p. 62.) After Pena-Santiago deducted the time from Plaintiff's time card, Plaintiff approached a different supervisor, Jim McCullough, and asked him to change the time back to 1:30 p.m. (*Id.* 62, Becker Deposition p. 168.) Jim McCullough changed the time card back to 1:30 p.m. (*Id.*)

When Pena-Santiago noticed the altered time card, she reported Plaintiff up the chain of command for violating Defendant's policy that prevents employees from clocking in early without permission so that they cannot gain unnecessary overtime. (Pena-Santiago Deposition p. 63.) Pena-Santiago recommended that Plaintiff should be terminated for committing time fraud, and Plaintiff suggests that she ultimately made the decision to discipline him for the time card incident. However, Defendant avers that the decision to issue a formal warning to the Plaintiff was made by the Plant Superintendent, Glenn Ruth, in conjunction with approval from Plant Manager, Tom Morse, who was Ruth's boss. (Resp. SMF 40.) Both Ruth and Morse are Caucasian males, and they felt that the warning issued to Plaintiff should be graded at the second level. (*Id.*) Plaintiff was issued what was graded as a second level warning under Defendant's three-stage progressive discipline policy in relationship to the time card incident. (Resp. to SMF ¶ 41, 43.)

**Plaintiff's January 2018 Loading Procedure Suspension**

On January 31, 2018, Plaintiff and Snead were assigned to load a shipment for Defendant's biggest client, Tyson. (Resp to SMF ¶ 45.) Tyson has strict loading procedures,

4

requiring that all of its shipments be hand loaded (i.e., goods are stacked by hand in the trailer) as opposed to "run in" by clamp truck (i.e., goods remain stacked and are dropped in the trailer). (*Id.*) Tyson would audit Defendant to ensure compliance with this requirement, and would complain if a shipment had been "run in," as opposed to hand loaded. (*Id.*) Defendant required its employees to load Tyson shipments by hand. (*Id.*; Pena-Santiago Deposition p. 102.)

Rather than load the Tyson shipment by hand, Plaintiff and Snead "ran in" the load. (Pena-Santiago Deposition p. 103; Becker Deposition pp. 138-142; Snead Deposition pp. 25-26.) Upon seeing this violation, another employee reported the misconduct to Pena-Santiago. (*Id.*) Pena-Santiago went out onto the floor and confirmed that Plaintiff and Snead were violating the Tyson loading procedure. (*Id.*) She confronted them, told them to stop running in the load, and informed them there might be further consequences. (*Id.*)

Plaintiff and Snead contend that Amarante gave them permission to run in the Tyson load, and Plaintiff testified that he told this to Pena-Santiago when she approached him on the floor. (Becker Deposition pp. 139-140; Snead Deposition 76.) When Pena-Santiago confronted Amarante, he denied authorizing Plaintiff and Snead to run in the load. (Amarante Deposition pp. 74:3-9, SJM Ex. C; ECF No. 18-10.) Plaintiff and Snead were both suspended for three days for the Tyson loading violation. (Resp. SMF ¶ 50.) Defendant alleges that Ruth made the decision to suspend Plaintiff and Snead for three days, and obtained approval for that decision from Morse, Human Resources, and the corporate office. (*Id.*) However, Plaintiff disputes this contention and believed that Pena-Santiago or Katie Driscoll actually made the decision to suspend Plaintiff for three days.[1]  The Employee Disciplinary Notice issued to Plaintiff explicitly

---

[1] Katie Driscoll was the Human Resources Manager for Defendant's facility in Reading, Pennsylvania. (Katie Driscoll Affidavit, ECF No. 18-5.)

5

states that "any further violation of Novipax's policies or procedures will result in your immediate termination. (Employee Disciplinary Notice, SMJ Ex. P.)

**Plaintiff's March 2018 Employment Termination**

Less than two months following Plaintiff's suspension, on March 13, 2018, Amarante allegedly noticed Plaintiff socializing with the loading crew on the dock. (Amarante Deposition p. 51.) Amarante proceeded to the production side and walked through the warehouse, a route that takes him approximately ten minutes to complete. (*Id*.; SJM Ex. Q & R.) When he returned to the dock, Plaintiff was allegedly still there, talking to the loading crew. (*Id*.)

The next day, March 14, 2018, Amarante alleges that he spoke to the two loading crew employees to let them know that they need to manage their time better. (Amarante Deposition pp. 53-54.) Amarante then went to find Plaintiff, intending to convey a similar message to him. (*Id.* pp. 55-56.) After Amarante found Plaintiff, the two men went to Amarante's office to discuss time management. (*Id.*) Once they got to Amarante's office the accounts of what transpired diverge significantly; however, both men agree that their conversation deteriorated into a profanity laced verbal altercation. (*Id*.; Becker Deposition p. 145.) Plaintiff claims that Amarante used foul language and got aggressive with him while Amarante claims that Plaintiff used foul language and got aggressive with him. (SMF ¶ 59.)

Amarante reported the verbal altercation up the chain of command and claimed that he felt threated by Plaintiff's aggressive behavior. (SMF ¶ 62.) Defendant opened an investigation into the matter, and Ruth, Driscoll, and Pena-Santiago met with Amarante to discuss what had occurred. (SMF ¶ 62.) They found Amarante's account of what occurred creditable, and Defendant decided to terminate Plaintiff. (SMF ¶ 64.) Plaintiff disputes which members of Defendant's team were actually involved in the decision to terminate his employment, and he

6

suggests that Pena-Santiago might actually have made the decision to terminate.  (Resp. to SFM ¶ 64.)  On March 19, 2018 Plaintiff's employment was terminated (SMF ¶ 65.)

As will be explained in more detail below, Defendant alleges that it terminated Plaintiff's employment for three progressive violations of its code of conduct.  (See Discussion § B herein.)

**II.     LEGAL STANDARD**

In reviewing a motion for summary judgment, a court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried before a jury.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 255.

The movant bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248).  A factual dispute is "material"

if it might well affect the outcome of the case under governing law. *Id*. (citing *Anderson*, 477 U.S. at 248).

A court must view the facts and draw all reasonable inferences in the non-moving party's favor. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004); *see also Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) ("In evaluating the evidence, we are required to view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion."). Nonetheless, a court need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## III. DISCUSSION

Plaintiff alleges reverse racial or ethnic discrimination in violation of Title VII and Section 1981. He alleges he was terminated because he is a Caucasian male who did not speak Spanish. (Becker Deposition p. 21.) The analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applicable to both of Plaintiff's claims brought on a theory of reverse-racial or ethnic discrimination. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181 (3d Cir. 2009) (the same analysis applies to Plaintiff's Title VII and Section 1981 claims because both claims are essentially reviewed in an identical manner). Under the *McDonnell Douglas* analysis, Plaintiff must first establish a prima facie case of discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant can articulate such a reason, the burden returns to the plaintiff who must then show that the

defendant's stated reason for the adverse employment action was a mere pretext for intentional discrimination. *Id.* at 804.

To establish a prima facie case of racial or ethnic discrimination in the employment context, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020). A plaintiff alleging a claim of reverse-racial discrimination under Title VII is not required to prove the first element of the prima facie case. *Iadimarco*, 190 F.3d at 157-58. Rather, the Third Circuit applies a modified prima facie analysis for allegations of "reverse discrimination," requiring the plaintiff to provide instead "sufficient evidence to allow a reasonable factfinder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of [his] race, color, religion, sex, or national origin.'" *Id.* at 163 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); *see Besko v. New Jersey Juvenile Justice Comm'n*, 558 F. App'x 295, 298 (3d Cir. 2014) (applying *Iadimarco*). In *Iadimarco v. Runyon,* 190 F.3d 151, 161 (3d Cir. 1999), the Third Circuit essentially held that "[A]ll that should be required to establish a prima facie case in the context of "reverse discrimination" is for the plaintiff to present sufficient evidence to allow a factfinder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."

In *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994), the Court held that in Title VII employment discrimination cases, to "defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff

must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." This holding is based upon the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which essentially states that a plaintiff in a Title VII discrimination case carries the initial burden of establishing a prima facie case of discrimination. *Id*. Once the plaintiff proves his prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id*. If the employer satisfies this burden, the burden of production returns to the plaintiff, who must show by competent evidence that the employer's reason for rejection was pretextual. *Id*. at 804-05. Notwithstanding this burden shifting framework, the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains with plaintiff. *Ade v. KidsPeace Corp.*, 401 Fed. App'x 697, 703 (3d. Cir. 2010).

**A.      Plaintiff Cannot Establish a Prima Facie Case of Reverse-Racial Discrimination**

Plaintiff cannot establish disparate treatment which is necessary to establish a prima facie case of reverse discrimination under the test established by *Iadimarco*, 190 F.3d at 161. Interestingly enough, Plaintiff's ability to satisfy the fourth element of the test for establishing a prima facie case of employment discrimination is equally dubious based on his inability to establish disparate treatment. Under the fourth element, the Plaintiff must prove that any adverse action occurred under circumstances that could give rise to an inference of discrimination. *Makky*, 541 F.3d at 214; *Ali*, 957 F.3d at 180.

In *Iadimarco*, the Third Circuit recognized the need to adapt the first prong of the prima facie test in reverse discrimination cases. In lieu of requiring a plaintiff to show he or she belongs to a protected group, the court held:

> [A]ll that should be required to establish a prima facie case in the context of "reverse discrimination" is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII.

*Iadimarco,* 190 F.3d at 161. The court went on to conclude that sufficient evidence must be presented "to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated the plaintiff 'less favorably than others because of [] race, color, religion, sex, or national origin.'" *Id*. at 163 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

In an attempt to establish disparate treatment, Plaintiff points to workplace incidents that were unrelated to the reasons for his termination. Plaintiff provides no examples of employees who committed three consecutive violations of Defendant's code of conduct who were not terminated.[2] Instead, Plaintiff points to a series of verbal interactions with supervisors that did not result in any formal disciplinary action being taken against him. In many of these instances, he openly admits that he does not know whether Hispanic Spanish speaking employees were spoken to or even reprimanded for similar conduct. Therefore, he cannot establish that he was singled out and treated less favorably than other similarly situated employees on the basis of a protected criteria under Title VII.

Plaintiff testified that Pena-Santiago or Amarante would frequently and unnecessarily remind him to wear his seatbelt when they saw him getting on or off a clamp truck. He indicated

---

[2] Defendant allegedly terminated Plaintiff for the October 12, 2017 time-clock warning, the January 31, 2018 loading procedures violation, and the verbal altercation with Amarante on March 13, 2018 in which Defendant determined that Plaintiff violated its code of conduct.

11

that he was chastised or reprimanded for not wearing a seatbelt when other employees were permitted to operate clamp trucks without wearing seatbelts. (Becker Deposition pp. 59-61.) Plaintiff did not clearly identify the race or ethnicity of the individuals whom he alleges were permitted to operate clamp trucks without wearing seatbelts or the dates when he witnessed these events transpire. (*Id.* pp. 60-61.) However, Plaintiff's coworker, Marc Snead, testified that at one point in time it was not uncommon for employees to operate clamp trucks without wearing seatbelts. (Snead Deposition p. 71, SMJ Ex. J, ECF No. 18-17.) Snead further testified that management ended the informal practice of optional seatbelt usage in relationship to clamp trucks, and that to his knowledge everyone at the warehouse wore a seatbelt from that point on. (*Id.* pp. 71.)

On the specific issue of seatbelts, Plaintiff testified that he honestly did not know if Hispanic Spanish speaking employees were ever spoken to or even chastised for not wearing seatbelts. (Becker Deposition pp. 60-61.) Plaintiff's allegation of disparate treatment based on seatbelt usage fails because he relies on his own unsupported, self-serving statements that amount to mere speculation. See *Solomon v. Soc'y of Auto. Eng'rs,* 41 Fed. Appx. 585, 586 (3d Cir. 2002) (affirming district court's rejection of claims based solely on the plaintiff's own testimony, stating "a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment.") (citing *Celotex Corp v. Catrett,* 477 U.S. 317, 324 (1986)); *see also Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 252 (3d Cir. 1999) (holding same). Any testimony to the effect that the Hispanic Distribution Coordinators were not wearing their seatbelts when operating truck jockeys, even if it were true, does not establish disparate treatment because Plaintiff fails to establish that the safety risks associated with the clamp trucks are equivalent to the risks associated with the truck jockeys. For these

reasons, the Plaintiff's claim of disparate treatment based on uneven enforcement of a seatbelt policy fails.

Plaintiff also alleged that Pena-Santiago unfairly enforced a regulation that prevented employees from wearing hats or hoodies on the warehouse floor. Plaintiff alleges that whenever Pena-Santiago saw him wearing a hat or hoody, she would unfairly single him out and remind him that he was not allowed to wear the item on the shipping floor of the warehouse. (Becker Deposition pp. 54, 56.) However, Plaintiff failed to clearly identify these alleged incidents as race-based disparate treatment. When asked which other employees were permitted to wear hats or hoodies, he responded that everybody would do it. (*Id.* 54.) Furthermore, he was unable to determine if other employees were spoken to and told not to wear hats or hoodies on the warehouse shipping floor. (*Id.* 54, 56.) As previously stated, Plaintiff's unsupported testimony is insufficient to withstand summary judgment. *See Solomon v. Soc'y of Auto. Eng'rs,* 41 Fed. Appx. 585, 586 (3d Cir. 2002) (affirming district court's rejection of claims based solely on the plaintiff's own testimony, stating "a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment.") (citing *Celotex Corp v. Catrett,* 477 U.S. 317, 324 (1986)); *see also Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 252 (3d Cir. 1999).

Plaintiff also alleged that when work was slow, he was assigned odd jobs like picking up trash outside of the warehouse or rearranging warehouse inventory. (Becker Deposition pp. 62-63, 69-70, 105-106.) He alleges disparate treatment based on the fact that certain favorite Hispanics Spanish speakers were not selected for unfavorable odd jobs. (*Id.*) However, Snead testified that it was not unusual for employees to occasionally be asked to preform odd jobs like

13

picking up trash outside of the warehouse or rearranging inventory on the warehouse floor. (Snead Deposition pp. 69-70.)

Plaintiff's testimony in relationship to the assignment of odd jobs, and his testimony to the affect that Hispanic Spanish speakers were permitted to socialize and rest in the breakrooms when work was slow is extremely dubious and lacking in foundation.  For example, when asked if employees were ever sent home when there was a lack of work, Plaintiff responded, "When work was slow, they offered you – you could go home without pay, you could go home and use a vacation day, or you could stay and they would find odd jobs for you to do."  According to Plaintiff, at least some of the time, the decision to perform odd jobs was optional which leaves open a question of whether the Hispanic Spanish speakers that he alleged loafed around the warehouse had declined the invitation to stay on the clock.  Left unanswered is the question of the level of compensation of his Spanish speaking coworkers.

In relationship to his allegations of disparate treatment, Plaintiff also raises questions about Hispanic Spanish speaking employees being permitted to take longer breaks to socialize and speak with one another and the Distribution Coordinators.  (Becker Deposition pp. 105-107; Snead Deposition pp. 35, 65, 67.)  Plaintiff alleges that all of this happened, while if Pena-Santiago saw him standing around, she would tell him to get back to work.  (Becker Deposition p. 81.)  Plaintiff claims that she gave him grief about his production numbers, said that he was not moving enough freight in an eight-hour shift, and that she was generally rude to him.  (*Id.* p. 71-72 & 74.)  However, Plaintiff was equally uncertain about whether Hispanic Spanish speakers were criticized for their production numbers and whether they were spoken to about socializing or taking longer than their allotted rest breaks.  (*Id.*)  It should also be mentioned that Plaintiff admittedly does not speak Spanish, so he would not have known what the Distribution

14

Coordinators were discussing with the Spanish speaking coworkers during the alleged longer breaks. (*Id.* pp. 21, 113.) Even if Plaintiff saw Hispanic coworkers lingering around speaking with one another in Spanish during workhours, it is uncertain whether he can credibly testify that these conversations were not work related and were purely social. Equally uncertain is whether Plaintiff could testify to the pay scale and employment status of these employees i.e., whether they were temporary or full-time, etc.

Plaintiff simply fails to come forward with credible evidence to establish a prima facie case of reverse employment discrimination; therefore, he is unable to overcome Defendant's motion for summary judgment. See *Jakimowicz v. City of Philadelphia*, No. 07-3327, 2010 U.S. Dist. LEXIS 65585, *9 (E.D. Pa. June 30, 2010). Plaintiff cannot show that he was treated differently than other workers based on a protected trait under Title VII.

As previously mentioned, Plaintiff's inability to establish disparate treatment also seriously calls into question his ability to establish the fourth element of the test necessary to establish a prima facie case of employment discrimination – that the adverse action occurred under circumstances that could give rise to an inference of unlawful discrimination. *Makky,* 541 F.3d at 214; *Ali*, 957 F.3d at 180. The plaintiff may satisfy the fourth element by identifying a similarly situated employee who shared all relevant aspects of his employment who was not terminated for similar conduct. *Warenecki v. City of Philadelphia*, No. 10-1450, 2010 U.S. Dist. LEXIS 116912, *20-22 (E.D. Pa. Nov. 3, 2010). Alternatively, because a plaintiff may be discriminated against because he is a member of a protected class without anyone similarly situated being treated differently, he may satisfy the fourth prong of a prima facie case by producing evidence of a "causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience,

15

that the defendant acted with discriminatory intent." *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261, 275 (3d Cir. 2010).

In an attempt to prove disparate treatment, Plaintiff cites to workplace incidents that are unrelated to the reason he was terminated. Defendant terminated Plaintiff for three progressive infractions of its code of conduct—the October 12, 2017 time-clock warning, the January 31, 2018 loading procedures violation, and the verbal altercation with Amarante on March 13, 2018 in which Defendant determined that Plaintiff violated its code of conduct. Plaintiff came forward with no evidence to establish that Hispanic Spanish speaking coworkers were caught committing similar infractions and were treated more favorably by Defendant. Furthermore, Plaintiff fails to establish a causal nexus between his race and any adverse employment action. *Warenecki*, 2010 U.S. Dist. LEXIS 116912 at *22; *Drummer v. Hosp. of the Univ. of Pennsylvania*, No. 16-2982, 455 F. Supp. 3d 160, 168 (E.D. Pa. Apr. 21, 2020).

The fact that Plaintiff was replaced by a Hispanic Spanish speaking coworker, Francisco Almonte, does nothing to change this analysis because Defendant came forward with credible evidence to establish that Almonte was the next eligible employee to be promoted under Defendant's established seniority system. (Defendant's Response to Interrogatories, Opposition Brief, Ex. U., ECF No. 22-8 p. 42; *see generally* Becker Deposition p. 37.)

**B.     Defendant Provided a Legitimate Nondiscriminatory Justification for Terminating Plaintiff**

Even if Plaintiff could establish a prima facie case of reverse discrimination, which he cannot, Defendant offers a legitimate nondiscriminatory justification for terminating Plaintiff. Therefore, the burden shifts to Plaintiff to establish that the justification was merely a pretextual excuse to hide its discriminatory intent. *McDonnell Douglas*, 411 U.S. at 802-804. Defendant alleges it terminated Plaintiff for three progressive infractions of its code of conduct—the

October 12, 2017 time-clock warning, the January 31, 2018 loading procedures violation, and the verbal altercation with Amarante on March 13, 2018 in which Defendant determined that Plaintiff violated its code of conduct.  Katie Driscoll, the Human Resources Manager for Defendant's facility in Reading, Pennsylvania, testified that Defendant maintained a three-stage progressive disciplinary policy as set forth in Defendant's counseling forms.  (Driscoll Deposition pp. 34-36, 54-55, SJM Ex. S, ECF No. 18-26; Katie Driscoll Affidavit, ECF No. 18-5.)  In reference to the counseling forms, she explained, "Well, progressive discipline is standard set practice in HR, and I follow the form: verbal, first warning, second warning, termination.  It is all on there to see" (Driscoll Deposition pp. 35-36.)  She further testified that the scale is adjusted depending on the severity of the infraction.  (*Id.*)

Plaintiff's verbal altercation with Amarante was Plaintiff's third violation of Defendant's code of conduct.  Defendant chose to believe Amarante's version of events in which he reported that Plaintiff became aggressive and threatening.  The fact that Plaintiff claims that Amarante lied about the verbal exchange does nothing to change the analysis.  The Defendant does not have to prove it was correct in all aspects of its decision to terminate.  Defendant simply needs to prove that the decision made good business sense and that it was not based on any discriminatory animosity.  In *Fuentes* the Court wrote:

> To discredit the employer's proffered reason…the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the nonmoving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them "unworthy of credence, and hence infer" that the employer did not act for [the asserted] nondiscriminatory reasons.

*Fuentes*, 32 F.3d at 764 (the employer may meet this burden by articulating any legitimate business reason for its action).  The defendant need not demonstrate that its decision was actually based on the proffered reasons, but merely that those reasons exist.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (*citing Board of Trustees v. Sweeney*, 439 U.S. 24, 25 (U.S. 1978)).  The plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  *Keller v. Orix Credit Alliance Inc.*, 130 F.3d 1101, 1109 (3d Cir. Nov. 24, 1997); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 471 (3d Cir. 2005) ("[T]he mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext."); *Ezold v. Wolf, Block Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) (noting that the court does not act as "member [] of an employer's promotion board or committee").

C.  **Plaintiff Cannot Establish that Defendant's Legitimate Nondiscriminatory Justification was Pretextual**

A plaintiff attempting to establish pretext has two alternatives.  Either the plaintiff may show that a reasonable factfinder would: "(1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action."  *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999).  To make the necessary showing of pretext under the first alternative, the plaintiff can "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."  *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994).  To make the necessary showing of pretext under the second alternative, the "[P]laintiff may show that the employer has previously discriminated against [him], that the employer has discriminated against other persons within the

18

plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998).

The evidence offered by the Plaintiff in an attempt to establish pretext is almost identical to the evidence he offers in an attempt to establish disparate treatment when attempting to establish a prima facie case of reverse employment discrimination.[3] As previously discussed herein above when addressing Plaintiff's inability to prove a prima facie case of employment discrimination, the Plaintiff fails to establish disparate treatment. He fails to establish that he was treated less favorably that another individual based on a protected trait under Title VII. Plaintiff cannot rely on his own self-serving testimony which amounts to speculation and conclusory allegations to avoid a motion for summary judgement. *Ridgewood*, 172 F.3d at 252. As alleged by Plaintiff, Pena-Santiago may well have been rude. Pena-Santiago, Amarante, and Contreras may also have spoken in Spanish so that Plaintiff could not understand what they were saying. The fact that they were rude or engaged in socially unacceptable behavior does not mean that Defendant engaged in discrimination.

Plaintiff further fails to establish that he was discharged under circumstances giving rise to an inference of employment discrimination. This is particularly true because both of the final decision makers were Caucasian men like Plaintiff. Both Plant Superintendent, Glenn Ruth, and the Plant Manager, Tom Morse, are Caucasian males and the evidence suggests that they were heavily involved in the decision to discipline the Plaintiff. (Glenn Ruth Affidavit, SJM Ex. 6,

---

[3] Plaintiff alleged uneven enforcement of workplace policies and referenced safety regulations such as seatbelt usage, the ability to wear a hat or hoodie, and the length or number of rest breaks permitted in a given shift. Plaintiff suggested that Tyson's prohibition on running in loads was applied unevenly. Plaintiff also alleged unfair assignment of odd jobs and the ability to socialize in Spanish when there was work that need to be completed.

ECF No. 18-6; Resp. SMF 40.) *Turgeon v. Marriott Hotel Servs.*, No. 99-4401, 2000 U.S. Dist. LEXIS 18688, at *27 (E.D. Pa. Dec. 27, 2000) ("Lastly, Hines, who was white, made the final decision to terminate Plaintiff [who was also white]. Therefore, Plaintiff has failed to establish a prima facie case of discrimination."); *Sherrod v. Booker T. Wah. Ctr.*, No. 04-028, 2006 U.S. Dist. LEXIS 102013 (W.D. Pa. July 24, 2006) (holding that inference of discrimination was rebutted where the individual who made allegedly racist comments was a member "of the same protected class as plaintiff"); *Dungee v. Northeast Foods, Inc.*, No. 95-5824, 940 F. Supp. 682 n.3 (D.N.J. 1996) (finding that a decision-maker's membership in plaintiff's protected class "weakens any compelling evidence of age discrimination").

## IV.   CONCLUSION

For these reasons, the Defendant's motion for summary judgment will be granted.


BY THE COURT:

　/s/ John Milton Younge　
Judge John Milton Younge